IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:13-CV-108-D

| | | |
|---|---|---|
| KIMBERLY CALHOUN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

In this action, pro se plaintiff Kimberly Calhoun ("plaintiff" or, in context, "the claimant") challenges the final decision of defendant Acting Commissioner of Social Security ("Commissioner") denying her application for a period of disability and disability insurance benefits ("DIB") on the grounds that she is not disabled. The case is before the court on four motions: (1) plaintiff's motion for default judgment (D.E. 28), in response to which the Commissioner filed a memorandum (D.E. 29); (2) plaintiff's motion for summary judgment (D.E. 25)[1]; (3) plaintiff's motion to amend her summary judgment motion (D.E. 30), for which the Commissioner's motion for judgment on the pleadings (D.E. 33) serves as a response; and (4) the Commissioner's motion for judgment on the pleadings, in response to which plaintiff filed a memorandum ("opposition memorandum") (D.E. 36). Plaintiff submitted evidence for the first time with her motions.

Also before the court are two filings by plaintiff (D.E. 7, 31) styled as suggestions of subsequently decided authority. The government filed a response to the second suggestion (D.E. 32) opposing its consideration by the court, to which plaintiff replied (*see* D.E. 35).

---

[1] This motion states that it also served as plaintiff's response to the Commissioner's now-withdrawn motion to dismiss. (*See* D.E. 9 (dismissal motion), D.E. 26 (notice of withdrawal)).

The motions, necessarily along with the suggestions, were referred to the undersigned Magistrate Judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* D.E. 37). For the reasons set forth below, it will be recommended that plaintiff's motion for default judgment be denied, her suggestions of subsequently decided authority be allowed, her motion to amend her summary judgment motion be allowed, her motion for summary judgment be denied, the Commissioner's motion for judgment on the pleadings be allowed, and the Commissioner's final decision be affirmed.

## I.     BACKGROUND

### A.     Case History

Plaintiff filed an application for DIB on 13 February 2009 alleging the onset of disability on 21 February 1999. Transcript of Proceedings ("Tr.") 51. The application was denied initially and upon reconsideration, and a request for hearing was timely filed. Tr. 51. On 12 April 2011, a hearing was held before an Administrative Law Judge ("ALJ") at which plaintiff, her sister, a friend, and a vocational expert testified. Tr. 67-116. The ALJ issued a decision denying plaintiff's claim on 26 April 2011. Tr. 51-61. Plaintiff timely requested review by the Appeals Council. Tr. 47. On 11 December 2012, the Appeals Council admitted additional evidence (Tr. 321-50, 1786-90), but denied the request for review. Tr. 1-5. At that time, the decision of the ALJ became the final decision of the Commissioner. 20 C.F.R. § 404.981. Plaintiff commenced this proceeding for judicial review on 14 February 2013, pursuant to 42 U.S.C. § 405(g). (*See In Forma Pauperis* Mot. (D.E. 1), Order Denying Mot. (D.E. 3), Compl. (D.E. 4)).

### B.     Standards for Disability

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id*. § 423(d)(3).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R. § 404.1509], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in [20 C.F.R. pt. 404, subpt. P, app. 1] ["listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity ["RFC"] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . . .

20 C.F.R. § 404.1520(a)(4).

The burden of proof and production rests with the claimant during the first four steps of the analysis. *Pass*, 65 F.3d at 1203. The burden shifts to the Commissioner at the fifth step to show that alternative work is available for the claimant in the national economy. *Id.*

In the case of multiple impairments, the Regulations require that the ALJ "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. If a medically severe combination of impairments is found, the combined impact of those impairments will be considered throughout the disability determination process. *Id.*

To establish entitlement to DIB, a claimant must show not only that he is disabled, but also that the disability began before the date of expiration of his disability insured status, known as the "date last insured" ("DLI"). 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. § 404.101(a); *Johnson v. Barnhart*, 434 F.3d 650, 655-56 (4th Cir. 2005).

## C. Findings of the ALJ

Plaintiff was 41 years old on her DLI, 31 December 2002, and 49 years old on the date of the hearing. *See* Tr. 59 ¶ 6. She has at least a high school education and past work as a sales engineer. Tr. 59 ¶ 6.

Applying the five-step analysis of 20 C.F.R. § 404.1520(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since her alleged onset date of 21 February 1999 through her DLI of 31 December 2002 ("relevant period"). Tr. 53 ¶ 2. At step two, the ALJ found that plaintiff had the following medically determinable impairment that was severe within the meaning of the Regulations: degenerative disc disease with surgery. Tr. 53 ¶

3.   At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or equals one of the listings.  Tr. 54 ¶ 4.

The ALJ next determined that plaintiff had the RFC to perform a limited range of work at the light exertional level.[2]  Tr. 54 ¶ 5.  Specifically, the ALJ found that plaintiff

> had the [RFC] to perform light work, as defined in 20 CFR 404.1567(b), except the claimant should avoid climbing of ladders, ropes, or scaffolds; should not climb ramps or stairs on more than an occasional basis; should not balance, stoop, crouch, kneel, or crawl on more than a frequent basis; should perform no more than frequent handling and fingering bilaterally; and should avoid exposure to excessive vibration, moving machinery, and unprotected heights.

Tr. 54 ¶ 5.

At step four, the ALJ accepted the testimony of the vocational expert and found that plaintiff was able to perform her past relevant work as a sales engineer, even if it required an

---

[2] Title 20, C.F.R. § 404.1567(b) defines "light work" as involving

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).  The *Dictionary of Occupational Titles* ("DOT") defines "light work" as:

> Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects.  Physical demand requirements are in excess of those for Sedentary Work.  Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.  NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

DOT app. C § IV, def. of "L-Light Work" (U.S. Dep't of Labor 4th ed. rev. 1991), http:// www.oalj.dol.gov/libdot.htm (last visited 21 July 2014).  "Light work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT.  *See* 20 C.F.R. § 404.1567.

option to alternate between sitting and standing. Tr. 59 ¶ 6; 111-13. The ALJ therefore concluded that plaintiff was not disabled at any time during the relevant period. Tr. 60 ¶ 7.

In the alternative, at step five of the sequential analysis, the ALJ assumed that plaintiff had the RFC to perform work at only the sedentary level[3] subject to the limitations he had previously found. Tr. 59 ¶ 6. The ALJ accepted the testimony of the vocational expert and determined that, considering this alternative RFC and the claimant's age, education, and work experience, there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of document preparer and surveillance system monitor. Tr. 60 ¶ 6. The ALJ made the further finding that "even if the claimant's depression and alleged medication side effects were found to be severe prior to the [DLI], she would be able to perform these positions on a sustained and continuous basis," that is, eight hours a day, five days a week, or an equivalent work schedule. Tr. 60 ¶ 6; *see* Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *2 (2 July 1996) (defining "regular and continuous" as eight hours per day for five days a week or its equivalent). Therefore, the ALJ concluded in the alternative that plaintiff had not been under a disability at any time during the relevant period. Tr. 60 ¶ 7.

### D.     Standard of Review

Under 42 U.S.C. § 405(g), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence

---

[3] Title 20 C.F.R. § 404.1567(a) defines sedentary as work "involv [ing] lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." Similarly, the DOT defines sedentary work as

> [e]xerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

DOT, app. C § IV, def. of "S-Sedentary Work."

in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Perales*, 402 U.S. at 401. When, as here, the Appeals Council accepts into the record evidence relating to the alleged period of disability not presented to the ALJ, the court "must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [Commissioner's] findings." *Wilkins v. Sec., Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc).

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131

7

F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

Where, as here, a claimant is proceeding pro se in the judicial review, the claimant's court filings are entitled to liberal construction. *See, e.g., Ruffin v. Lockheed Martin Corp.*, Civil No. WDQ–13–2744, 2014 WL 2069988, at *1 n.1, 3 (D. Md. 15 May 2014) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed . . . .")). Such construction appropriately includes consideration of arguments germane to a motion by a claimant even if they are set out in a filing by the claimant nominally addressed to another motion.[4]

E.    **New Evidence**

Sentence six of 42 U.S.C. § 405(g) ("sentence six") provides for remand when evidence is submitted for the first time at the district court level. Sentence six permits remands "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see Stanley v. Colvin*, No. 7:12-CV-134-FL, 2013 WL 2447850, at *7 (E.D.N.C. 5 Jun. 2013); *Edwards v. Astrue*, No. 7:07CV48, 2008 WL 474128, at *8 (W.D. Va. 20 Feb. 2008). There are accordingly three distinct requirements under sentence six.

First, the evidence must be new. "Evidence is deemed new if it is not duplicative or cumulative of evidence already in the record." *Wilkins v. Sec'y of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991); *Stanley*, 2013 WL 2447850, at * 7. Second, the evidence must be material. Evidence is material if there is a reasonable possibility that it would have changed the

---

[4] Given the state of plaintiff's filings, the court has had to invoke this specific principle frequently as part of its liberal construction of her filings.

Case 5:13-cv-00108-D   Document 41   Filed 07/22/14   Page 8 of 35

outcome. *Wilkins*, 953 F.2d at 96. Third, there must be good cause for failing to submit the evidence earlier. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985). The burden of showing that the requirements of sentence six are met rests with the claimant. *See Fagg v. Chater*, 106 F.3d 390 (Table), 1997 WL 39146, at *2 (4th Cir. 3 Feb. 1997); *Keith v. Astrue*, No. 4:11CV0037, 2012 WL 2425658, at * 2 (W.D. Va. 22 Jun. 2012) ("The burden of demonstrating that all of the Sentence Six requirements have been met rests with the plaintiff."), *rep. and recommendation adopted by* 2012 WL 4458649 (9 Aug. 2012).

## II. PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

Plaintiff served process on the United States Attorney in this district on 30 April 2013. (*See* Ex. A to Pl.'s Mot. for Default J. (D.E. 28-1) 1, 2). The Commissioner's response to the complaint was required to be served within 60 days, that is, by 1 July 2013. *See* Fed. R. Civ. P. 6(a)(1)(C) (excluding Saturday and Sunday as last day of period), 12(a)(2) (allowing United States agencies 60 days to respond to complaint). Prior to this deadline, on 27 June 2013, the Commissioner filed and certified that it served on plaintiff a motion (D.E. 9) to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), alleging that plaintiff did not timely commence this action. On 23 July 2013, the Commissioner withdrew the dismissal motion. (*See* D.E. 26). The following day, 24 July 2013, the Commissioner filed and certified that it served on plaintiff her answer (D.E. 27) to the complaint.

On 1 August 2013, plaintiff filed her motion for default judgment, pursuant to Rule 55(b)(2). In support, she contends that the Commissioner failed to respond timely to the complaint. She seeks an order providing her the benefits that materials from the SSA informed her she would receive if she were found disabled. (*See* Ex. D to Pl.'s Mot. for Default J. (D.E. 28-4) 2).

At the outset, the court notes that irrespective of the timeliness of the Commissioner's response to the complaint, default judgment is not warranted. Among other reasons, plaintiff failed to obtain an entry of default before moving for default judgment, as required by Rule 55(a). *See, e.g., Structural Concrete Products, LLC v. Clarendon America Ins. Co.*, 244 F.R.D. 317, 328 (E.D. Va. 2007) (holding that entry of default is a prerequisite to obtaining a default judgment). In addition, a default judgment may be entered against an agency of the United States "only if the claimant establishes a claim or right to relief by evidence that satisfies the court." Fed. R. Civ. P. 55(a). Plaintiff has made no such showing, as discussed herein. Further, entry of default judgment would violate the "strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed on their merits." *Colleton Preparatory Academy, Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010).

On the issue of timeliness, plaintiff fares no better. She argues, for example, that the Commissioner did not mail her motion to dismiss on the date it was filed, but instead not until at least six days later, 3 July 2013, which would be past the 1 July 2013 deadline for the Commissioner's response. But she offers no evidence proving her contention. In the absence of such proof, the court credits the certification by the Commissioner's counsel with the motion that he mailed the dismissal motion on the day of filing, 27 June 2013. (*See* Mot. 2). In any event, on 28 June 2013, the clerk sent plaintiff a copy of the dismissal motion, along with a letter advising her of the need to respond to it. (*See* D.E. 23). Thus, the dismissal motion was served timely.

Plaintiff also contends that the Commissioner did not serve her answer timely. Under Rule 12(a)(4), a responsive pleading is due within 14 days after notice of the court's action on a Rule 12(b)(1) motion. In accordance with this provision, the deadline for the Commissioner's

answer to the complaint was effectively tolled while her dismissal motion was pending, from 27 June 2013 to 23 July 2013.

Plaintiff appears to contend, to the contrary, that the Commissioner's motion to dismiss was a sham and it should be disregarded for purposes of her default judgment motion. The court is unpersuaded. The docket on its face suggests that plaintiff's complaint was untimely. The complaint was filed on 19 April 2013 (*see* D.E. 4), 129 days after the Appeals Council issued its decision denying review on 11 December 2012. A claimant must file an action for judicial review of such a final decision within 60 days after receipt of notice of the decision, unless the Appeals Council grants an extension, and the Regulations presume 5 days for receipt of notice after its issuance. *See* 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.901, 404.981, 422.210(e). Thus, rote application of these provisions provides a complaint deadline for plaintiff of 14 February 2013.[5]

In fact, though, the deadline was equitably tolled by plaintiff's commencement of this case on 14 February 2013 by filing a motion to proceed *in forma pauperis* (D.E. 1), which was accompanied by a proposed complaint (D.E. 1-1). *See, e.g, Clemonts v. Colvin*, No. 4:13-CV-00015-BO, 2013 WL 2327077, at *1 (E.D.N.C. 28 May 2013). The order denying the motion gave plaintiff until 22 April 2013 in which to file her complaint, a deadline that she met by filing the complaint on 19 April 2013. (*See* D.E. 3 at 2). In apparent recognition of these facts, the Commissioner ultimately withdrew her motion. The court cannot say that the foregoing circumstances show bad faith or other improper conduct by the Commissioner warranting disregard of her dismissal motion for purposes of plaintiff's default judgment motion.

---

[5] Plaintiff apparently requested an extension of time from the Appeals Council to file for judicial review, but it was not granted. *See* Compl. ¶ 8.b; 1 Feb. 2013 Ltr. from Pl. to Appeals Council (D.E. 36-9) (attached as Ex. I to plaintiff's opposition memorandum).

Plaintiff further argues that the Commissioner did not serve her answer timely after withdrawal of the dismissal motion. There does not appear to be controlling authority on the deadline for answering in this circumstance. If the 14-day period for answering after notice of court action on a dismissal motion applies, the Commissioner's answer was required to be served by 6 August 2013. According to the certificate of service on the answer, the Commissioner easily met this deadline by serving the answer on 24 July 2013. (*See* Answer to Compl. 6).

Plaintiff contends that the Commissioner did not mail the answer to her complaint until 29 July 2013, citing the postmark on the envelope for it; she did not receive the answer until 2 August 2013; and she had complained to the clerk about the late service on 1 August 2013. Plaintiff did not submit the envelope in question,[6] and the court credits the certificate of service with the answer. In any event, as indicated, plaintiff admits to receiving the answer on 2 August 2013, again, well before the 14-day deadline of 6 August 2013.

If instead of the answer being due 14 days after withdrawal of the dismissal motion it was due the day of withdrawal, 23 July 2013, arguably when the tolling ended, the Commissioner's answer was served only a day late according to the certificate of service with it. Such a minimal delay does not warrant default judgment. Even if the answer was not mailed until several days later—thereby accounting for plaintiff's receipt of it on 2 August 2013—the tardiness would again be minimal and not justify default judgment. For this and the other reasons stated, plaintiff's motion for default judgment should be denied.

---

[6] The court recognizes, of course, that while postmarks can be used as evidence of date of mailing, the postmark is not conclusive, and the defining moment for service under Rule 5 is when the mail reaches a post office or post office box. *See* Charles Alan Wright, et al., *Fed. Practice and Procedure Civil* § 1148 (3d ed. Supp. 2014). Similarly, while the date of receipt may provide insight into the date of mailing, service is complete upon mailing. *See* Fed. R. Civ. P. 5(b)(2)(C).

## III. PLAINTIFF'S SUGGESTIONS OF SUBSEQUENTLY DECIDED AUTHORITY

Plaintiff filed her first suggestion of subsequently decided authority on 26 April 2013 (D.E. 7) and the second on 30 August 2013 (D.E. 31). Attached to each is a decision from a different district court ordering remand of a Social Security disability case. *Rodriguez v. Astrue*, No. 5:11–CV–01087–RDP, 2012 WL 2862418 (N.D. Ala. 6 July 2010) (slip op. version filed at D.E. 7-1); *McKinney v. Astrue*, No. 10 C 2134, 2011 WL 3704259 (N.D. Ill. 22 Aug. 2011) (slip op. version filed at D.E. 31-1). Plaintiff clearly intends that the suggested authorities be considered on the merits of her claim for DIB.

Local Civil Rule 7.1(g), E.D.N.C., permits the filing of subsequently decided authority on the following terms:

> A suggestion of subsequently decided *controlling* authority, without argument, may be filed and served at any time prior to the court's ruling and shall contain only the citation to the case relied upon if published or a copy of the opinion if the case is unpublished.

Local Civ. Rule 7.1(g), E.D.N.C. (emphasis added).

As the Commissioner argues, the second suggestion by plaintiff does not come within the scope of this rule because the decision subject to it cannot reasonably be deemed "controlling." It was issued by a district court outside the Fourth Circuit. The same is true of the first suggestion.

Moreover, neither of the authorities suggested by plaintiff was "subsequently decided" within the meaning of the rule—that is, decided after plaintiff had already filed the memoranda permitted her on the motions subject to the suggestions.[7] The motions at issue here are plaintiff's motion for summary judgment and the Commissioner's motion for judgment on the pleadings. She filed the first suggestion—on 26 April 2013—only a week after filing her

---

[7] Plaintiff may have understood "subsequently decided" to signify after the ALJ's decision since both decisions in question were issued then (although not after the Appeals Council's decision denying review).

complaint and before any motions other than her motion to proceed *in forma pauperis* had been filed in the case by either party. While plaintiff filed her second suggestion—on 30 August 2013—after her motions for summary judgment, default judgment, and amendment of her summary judgment, the filing came before the Commissioner's motion for judgment on the pleadings and her opposition memorandum in response to that motion. Thus, neither suggestion comes within the scope of Local Civil Rule 7.1(g).

Nonetheless, plaintiff could have cited the suggested authorities—and presented argument regarding them—in her response to the Commissioner's motion for judgment on the pleadings. The court sees no cognizable prejudice to the Commissioner from its consideration of the authorities suggested by plaintiff. It will therefore be recommended that, in the court's discretion, consideration of the suggested authorities be approved. In accordance with this recommendation, the undersigned has considered the suggested authorities in addressing plaintiff's motion for summary judgment and the Commissioner's motion for judgment on the pleadings.

## IV.   PLAINTIFF'S MOTION TO AMEND HER SUMMARY JUDGMENT MOTION

On 22 August 2013, plaintiff filed her motion (D.E. 30) to amend her summary judgment motion (D.E. 25), which itself had been filed on 18 July 2013. By the amendment motion, she seeks to supplement her summary judgment motion with four exhibits, labeled Exhibits C to F (D.E. 30-1 to 30-3).[8] It will be recommended that the motion to amend be allowed and that these exhibits be treated as if they were filed with plaintiff's summary judgment motion.

Consistent with this recommendation, the court has considered whether any of these exhibits require remand of this case pursuant to sentence six. None do.

---

[8] The summary judgment motion had appended to it Exhibits A and B, which are discussed below.

Exhibits C to E are copies of an envelope from this court's clerk's office to plaintiff postmarked 2 July 2013 (Ex. C); shipping labels from the Social Security Administration ("SSA") to plaintiff for the administrative transcript which plaintiff purportedly received on 6 July 2013 (Ex. D); and an envelope from the SSA to plaintiff purportedly postmarked 29 July 2013 (Ex. E). Plaintiff proffers these documents in support of her contention that she is entitled to summary judgment on the grounds that the Commissioner has continually served her tardily with documents the Commissioner has filed in this case in violation of the Federal Rules of Civil Procedure. These exhibits are not material within the meaning of sentence six because they relate to the conduct of this court case, not the merits of her disability claim.

Exhibit F consists of a letter from the SSA to plaintiff dated 3 March 2009 requesting medical releases (D.E. 30-4 at 1) and two documents that apparently accompanied the letter: a three-page statement setting out facts about Social Security benefits relating to plaintiff, including the monthly benefit she would receive if she qualified for benefits ("facts statement") (D.E. 30-4 at 2-4); and a summary of plaintiff's oral application on 18 February 2009 for benefits (D.E. 30-4 at 5-6).[9] Plaintiff apparently seeks to have Exhibit F considered on the merits of her claim for benefits.

The letter requesting medical releases is not material within the meaning of sentence six, and plaintiff has not shown good cause for not submitting it at an earlier stage in the proceedings. The portion of the facts statement listing plaintiff's earnings over the years is duplicative of the certified earnings statement already in the record (*see* Tr. 236-37) and therefore not new. The other portions of the facts statement are not material, and plaintiff has not shown good cause for not submitting the facts statement earlier. The summary of plaintiff's oral application is already

---

[9] Exhibit F is the same as Exhibit D to plaintiff's motion for default judgment (D.E. 28-4). The facts statement is also attached as Exhibit D (D.E. 36-4) to plaintiff's opposition memorandum.

in the record and is therefore duplicative.  *See* Tr. 229-30.  Thus, Exhibit F, like the other exhibits subject to plaintiff's motion to amend, does not require remand under sentence six.

## V.  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND THE COMMISSIONER'S MOTION FOR JUDGMENT ON THE PLEADINGS

### A.  Plaintiff's Exhibits

Plaintiff appended to her motion for summary judgment 2 exhibits and to her response to the Commissioner's motion for judgment on the pleadings 12 exhibits.  An initial inquiry for the court in addressing these motions is whether any of the exhibits requires remand under sentence six.  None do.

The two exhibits to plaintiff's summary judgment motion, Exhibit A (D.E. 25-1) and Exhibit B (D.E. 25-2) are copies of the civil cover sheet and docket sheet in this case, respectively.  These exhibits do not relate to the substance of plaintiff's disability claim and are not material under sentence six.

The following exhibits to plaintiff's opposition memorandum are not new or material under sentence six because they already appear in the administrative record at the transcript pages specified:  (1) Exhibit C (D.E. 36-3), deposition excerpt (Tr. 1787); (2) Exhibit E (D.E. 36-5), a denial letter to plaintiff from the SSA dated 17 August 2009 (Tr. 137); (3) Exhibit F (D.E. 36-6), a denial letter to plaintiff from the SSA dated 27 January 2010 (Tr. 146); (4) part of Exhibit G (D.E. 36-7 at 1-7), a letter from plaintiff to the Appeals Council dated 18 October 2012 (Tr. 9-16); and (5) Exhibit L (D.E. 36-12), Work History Report form (with a handwritten comment by plaintiff)[10] (Tr. 254).

Exhibit A (D.E. 36-1) is a copy of a Medical and Job Worksheet form purportedly completed by plaintiff.  The form indicates that it is designed to help a claimant prepare for an

---

[10] The comment by plaintiff included in this exhibit is in the nature of argument, and the court has treated it as such.

interview by the SSA.  (*See* Ex. A) ("Completing this worksheet will help you get ready for the interview.").  The form is not material because it provides information found elsewhere in the record.  Plaintiff has also failed to show good cause for not having submitted it earlier.

Exhibit B (D.E. 36-2) is a 48-page chart purportedly prepared by plaintiff setting out a detailed chronology of treatment she allegedly received, her response to it, her employment history, and related information.  To the extent this chart provides information already in the record, it is not new, but cumulative.  Plaintiff has not shown with respect to the exhibit as a whole good cause for not submitting it previously.

Exhibit D (D.E. 36-4) is a copy of the facts statement previously discussed (as part of Exhibit F to plaintiff's motion to amend) apparently accompanying a letter dated 3 March 2009 from the SSA to plaintiff.  As noted, the facts statement is partially duplicative of earnings history information in the record and therefore not new; the facts statement is not material; and she has not shown good cause for failing to submit it earlier.

The remaining portion of Exhibit G and two other exhibits are copies of letters from plaintiff to the SSA:  (1) the portion of Exhibit G (D.E. 36-7 at 8-9) is a letter dated 18 October 2012 requesting more time to submit a response to the ALJ's decision, complaining of problems with the compact disks of records the SSA sent her, and describing some of her impairments; (2) Exhibit H (D.E. 36-8) is a letter dated 12 December 2012 addressing the same basic topics as the prior letter; and (3) Exhibit I (D.E. 36-9) is a letter dated 1 February 2013 complaining of purportedly tardy mailing of the notice of denial of review by the Appeals Council and requesting additional time to commence a judicial appeal.  None of these letters is material.  The letters comprising part of Exhibit G and Exhibit H are not material because the denial of review by the Appeals Council is not a final, appealable order.  *See Gill v. Colvin*, No. 7:12-CV-72-FL,

2013 WL 1817353, at *4 (E.D.N.C. 4 Mar. 2013), *mem. and recommendation adopted by* 2013 WL 1817227 (29 Apr. 2013). The letter comprising Exhibit I is not material because, among other reasons, plaintiff timely commenced this action.

Exhibit J (D.E. 36-10) presents comments by plaintiff on the two state agency physical RFC assessments of plaintiff in the record (Tr. 127-34, 707-14) and includes excerpts from those assessments. Portions of plaintiff's comments are in the nature of argument, and the court has treated them as such. Other portions purport to present facts. They are not material and plaintiff has not shown good cause for not presenting them earlier. The excerpts from the assessments included in the exhibit obviously duplicate the assessments in the record and are therefore not new or material.

Finally, Exhibit K (D.E. 36-11) is a letter to the Raleigh *News and Observer* dated 24 September 2013 complaining of a potential government shutdown. The article has no relevance to this case and is clearly not material.

## B.    Discussion

Plaintiff asserts a broad array of challenges to the ALJ's decision. The court has considered carefully all arguments she raises.[11]   Her arguments warranting discussion are addressed below.

---

[11] In her response to plaintiff's motion for default judgment (D.E. 29 at 3 ¶ 4), the Commissioner states, without citation to any authority, that she does not consider plaintiff's motion for summary judgment to be such a motion (or a motion for judgment on the pleadings) because it was filed before the Commissioner served her answer to the complaint and it requests an award of benefits without addressing the merits of the case. The court finds this proposition unconvincing. Rule 56 permits the filing of a summary judgment motion "at any time until 30 days after the close of all discovery," unless otherwise provided by local rule or order, which is not the case here. Fed. R. Civ. P. 56(b); *cf. Rashidi v. Albright*, 818 F. Supp. 1354, 1357 (D. Nev. 1993) (holding that the court could decide defendants' summary judgment motion before defendants answered the complaint). Plaintiff's motion for summary judgment is in adequate form in light of her pro se status and her subsequently filed opposition memorandum, which sets out grounds upon which she seeks an award of benefits.

### 1. Incorrect and Missing Records

Plaintiff alleges that the ALJ relied on medical records that were not hers and that some medical records of hers were excluded from the administrative record. It is true that the Appeals Council removed from the administrative record portions of Exhibit 9F (Tr. 493-515) because they related to a person other than plaintiff.[12] The ALJ does not cite to this exhibit in his decision, and there is no other indication that he relied on it. Plaintiff has not specifically identified any other medical records relating to another person or any missing medical records.

The court's review of the record has not revealed any medical records relating to another person. Nor has the court been able to discern that any of plaintiff's medical records have been excluded from the administrative record. It has confirmed that all medical records listed as exhibits (excluding the removed portions of Exhibit 9F) are actually included in the administrative transcript. The court concludes that this challenge by plaintiff to the ALJ's decision is baseless.

### 2. Wrong Date for Alleged Onset of Disability

Plaintiff contends that the ALJ erred in finding that plaintiff's alleged date of onset of disability was 21 February 1999. She argues that the correct date is February 1997. (*See* Pl.'s Opp. Mem. 2).

Substantial evidence supports the ALJ's determination. The application summary for DIB for plaintiff, dated 3 March 2009 and designated Exhibit 1D (Tr. 229-32), states that it is a record of information obtained from plaintiff during an interview by the SSA on 18 February 2009 (Tr. 229). It gives the alleged onset date as 21 February 1999: "I became unable to work

---

[12] A statement indicating the removal has been substituted for the record removed on each transcript page in question. There does not appear to be a separate order of removal in the administrative record.

because of my disability condition on February 21, 1999." Tr. 229. The ALJ admitted this document into evidence at the hearing with the consent of plaintiff's counsel. *See* Tr. 71-72.

A Disability Report—Field Office form for plaintiff, designated as Exhibit 3E (Tr. 268-70), also lists the alleged onset date as 21 February 1999. This exhibit also came into the record at the hearing with plaintiff's counsel's consent. Tr. 71-72. Plaintiff did not otherwise challenge the alleged onset date of 21 February 1999 before the ALJ.

To support her claim, plaintiff cites to the worksheet attached as Exhibit A (D.E. 36-1) to her opposition memorandum. There, plaintiff stated her date of onset of disability not as 21 *February* 1997, not as she now argues, but rather an unspecified date in *July* 1997 (*i.e.*, "7/__/1997"). As noted, she did not submit this document to the ALJ or the Appeals Council, and did not justify her failure to do so.

Plaintiff also cites to a Disability Report—Appeals form she completed on 23 June 2011, after the ALJ's decision. Tr. 45. In it, she references her diagnosis with syrinx in 1997, describes her alleged symptoms, and instructions from her physician to limit her activities. Tr. 45. This information, though, is cumulative of other evidence in the record that was before the ALJ. In addition, the ALJ properly found plaintiff's allegations regarding the severity and limiting effect of her impairments to be less than fully credible (as discussed further below). *See* Tr. 57-58.

Plaintiff cites to the cessation of her employment in 1997 (other than self-employment)[13] as proof that her disability started then. She cites to a Work History Report form in the record showing that she was employed until May 2007 and her handwritten notation that the year

---

[13] Plaintiff reported to a physician during the September 2000 emergency room visit discussed below that she was self-employed. *See* Tr. 395. A coworker and friend of plaintiff confirmed in a letter included in the record that plaintiff started her own business at some point after her surgery. *See* Tr. 310.

should be 1997 (*i.e.*, "Typo 1997"). (*See* Ex. L to Opp. Mem. (copy of Tr. 254 with notation)). But the certified earnings report in the record shows that her employment ceased in 1997. *See* Tr. 237. Needless to say, the fact that a person stops working does not necessarily mean that the person is disabled from working within the meaning of the Act and Regulations.

In any event, plaintiff has not shown that if the ALJ had adopted the onset date she now alleges, the outcome on her disability claim could reasonably be expected to have been different. Thus, even if the ALJ were deemed to have used the incorrect disability onset date, the error was harmless.

For this and the other reasons stated, plaintiff's challenge to the alleged onset date of her disability should be rejected.

### 3.     Assessment of Syrinx

Plaintiff has the spinal condition of syrinx, also known as syringomyelia and segemental dysfunctional syndrome, among other names.[14] The ALJ did not find plaintiff's syrinx to be a severe impairment—that is, one that imposed more than a minimal limitation on the ability to do basic work activities. *See* Soc. Sec. Ruling 85–28, 1985 WL 56856, at *3 (1 Jan. 1985); *see also* 20 CF.R. § 404.1520(c) (providing that an impairment is severe only if it "significantly limits . . . [a claimant's] physical or mental ability to do basic work activities"). Plaintiff argues, in effect, that her syrinx is disabling and that the ALJ erred in not so finding. The court finds no error.

The ALJ accurately summarized the principal medical evidence relating to plaintiff's syrinx, as well as her degenerative disc disease, during the relevant period as follows:

---

[14] Syrinx is the presence of fluid-filled cavities in the spinal column that can result in pain and paresthesia (*i.e.*, the sensation of pricking, tingling, or creeping on the skin), atrophy of the hands, and spastic paralysis of the legs, among other symptoms. *See* Def. of "syringomyelia," *Stedman's Medical Dictionary* (27th ed. 2000).

The medical evidence shows the [claimant] underwent an MRI on May 9, 1997, for right-sided shoulder pain and numbness, and mid thoracic pain. A review of the cervical spine [Tr. 406] was negative; however, a review of the thoracic spine showed possible disc herniations at the T6-7 and T9-10 [and a syrinx cavity from the upper to lower thoracic spine] [Tr. 407]. The claimant was thereafter seen at Highwoods Chiropractic by John Smith, D.C., who drafted a letter [Tr. 352] indicating the claimant received injuries from a physical assault that occurred on July 29, 1997. She was seen on July 31, 1997, for neck and mid back strains; the provider noted she had an existing spinal segmental dysfunction syndrome (syrinx at the T4). While the provider noted the claimant had previously treated with the practice, he opined her pre-existing condition was aggravated by the assault. A repeat MRI taken of the thoracic spine on December 19, 1997 [Tr. 408-09], confirmed the presence of a disc herniation at the T6-7 causing mild mass effect onto the cord and a less severe protrusion at the T7-8. (Ex. 1F, 5F).

Neurosurgeon Michael Haglund, M.D., Ph.D., of Duke University Medical Center drafted a letter on April 15, 1998 [Tr. 356-57], indicating the claimant did not have significant pain prior to her assault but later had radiculopathy and pain and numbness of the lower extremities stemming from an injured thoracic disc. He opined the claimant's T6-7 discectomy performed on February 24, 1998, relieved her symptoms but her spinal condition of syringomyelia should be followed over a long period of time. The doctor also noted the main result of the assault was likely the claimant's herniated disc at the T6-7 more so than her syringomyelia; but again affirmed the majority of the claimant's symptoms were resolved with surgery. In summary, Dr. Haglund assigned a 15% permanent partial impairment rating to the spine and noted her syrinx should remain stable as long as she does not have further degeneration of the disc. (Ex. 3F, 11F).

An MRI taken on November 27, 1998 [Tr. 636], demonstrated postoperative change[s] at the T6-7 without residuals or recurrent herniation and no mass effect on the cord; a stable appearance to the disc herniation at the T7-8; and no significant change on the syrinx. A slight disk bulge was noted at the C5-6. There was no significant change noted on the claimant's repeat thoracic MRIs on April 13, 2000 [Tr. 634], January 24, 2001 [Tr. 633], and March 5, 2002 [Tr. 632]. (Ex. 11F).

Tr. 56-57 ¶ 5.

Thus, as this evidence indicates, in May 1997, plaintiff was diagnosed with syrinx and in July 1997 suffered the attack that aggravated her pre-existing condition, but in February 1998 Dr. Haglund performed a discectomy that he determined relieved the majority of her symptoms. He further opined that plaintiff had only a 15% permanent partial disability rating of her spine and

that her syrinx should remain stable absent further disc degeneration. It is apparent that the ALJ gave these opinions significant weight and did so properly given Dr. Haglund's role as a treating physician, his specialization in spine surgery, and the consistency of his opinions with the record as a whole. *See* 20 C.F.R. § 404.1527(d)(2), (4), (5). Subsequent MRIs of plaintiff's spine through March 2002, in fact, found no significant change in the syrinx.

Also relevant are two visits by plaintiff to the emergency room of Rex Hospital, one on 5 November 1999 and the other on 4 September 2000, both discussed by the ALJ. *See* Tr. 57 ¶ 5. The 5 November 1999 visit concerned an injury plaintiff sustained to her left knee from a slip and fall two days earlier. Tr. 57 ¶ 5; 400. She was found to have a left knee strain. Tr. 57 ¶ 5; 401. The ALJ noted, in bold and underlined text, the following:

> **Although the claimant reported occasionally taking Flexeril and pain medication, she indicated she was not taking any medication at that time. She also indicated she did not have any neck or back pain and did not have any paresthesias or paralysis.**

Tr. 57 ¶ 5. This evidence tends to substantiate that at the time of this visit plaintiff's syrinx was not a severe impairment.

At the 4 September 2000 visit, about a year later, plaintiff was treated for left arm and elbow pain she sustained from another fall. Tr. 57 ¶ 5; 395. As at the November 1999 visit, plaintiff reported that she was not experiencing any neck or back pain at the time and had no paresthesias with the injury. Tr. 57 ¶ 5; 395, 396. Plaintiff reported that she incurred the injury while rollerblading with her son and that she was self-employed. Tr. 57 ¶ 5; 395. The evidence of this visit therefore also tends to show that plaintiff's syrinx was not a severe impairment.

While most of the remaining medical evidence originated after the DLI, as the ALJ notes, plaintiff "emphasized" in a 16 December 2004 visit to a cardiologist that "until recently" she was able to do such activities as climbing stairs "without difficulty." Tr. 1438; 57 ¶ 5 (reference by

ALJ). She had reported in a visit to the same physician the prior month that she was "regularly" walking two to four miles daily. Tr. 1446; 57 ¶ 5 (reference by ALJ). The ALJ deemed plaintiff's December 2004 representation, by its terms retrospective in nature, to provide at least some insight into plaintiff's level of activity during the relevant period. The level of activity suggested was, of course, clearly inconsistent with the plaintiff's allegations of disabling limitations from syrinx and her other impairments. The court cannot say that it was improper for the ALJ to make this inference.

Other evidence tending to support the ALJ's determination that plaintiff's syrinx was not severe includes representations she apparently made to a physician during a 5 November 2004 visit to the emergency room prompted by chest pain that her 1998 surgery relieved syrinx-based symptoms she was having:

> [T]he presence of a decompressed syrinx in the dorsal spine . . . produced by itself some symptoms in her extremities, mainly numbness, weakness and tingling in the past up until the time it was decompressed 7 years ago.
>
>     . . . .
>
> Seven years ago she had surgery to fix a syrinx in the upper dorsal area of the spine. Prior to the surgery, she had weakness with numbness and tingling in the right sided extremities and in both legs and it was difficult to walk. *She had a remarkable recovery over the last seven years after the pressure in the nerve tracts was relieved along the spine. She tells me she has an MRI scan of her spine once a year and she's been doing well with that.*

Tr. 370 (emphasis added).

There is also evidence that plaintiff was self-employed at some point after her surgery: her report during the September 2000 emergency room visit that she was self-employed (Tr. 395) and a letter of record from a coworker and friend about plaintiff's business (as well as the help the coworker and friend, and others provided plaintiff with it) (Tr. 310). Admittedly, though,

this evidence does not show the nature of the business, the amount of work it required of plaintiff, or the specific time period in which it operated.

In any event, as the foregoing discussion indicates, the ALJ clearly did consider plaintiff's syrinx in determining that she was not disabled. This is decidedly not a case in which the ALJ simply disregarded the impairment at issue. Even if it were considered error for the ALJ not to find plaintiff's syrinx to be a severe impairment at step two of the sequential analysis, the fact that he considered it at subsequent steps would render any such error harmless.[15] *See, e.g., McClain v. Colvin*, No. 1:12CV1374, 2014 WL 2167832, at *4 (M.D.N.C. 23 May 2014).

Moreover, consistent with the ALJ's consideration of plaintiff's syrinx, his principal and alternative RFC determinations were responsive to the types of restrictions potentially imposed by syrinx. The RFC determinations were at the two lowest exertional levels and included, as indicated, such specific limitations as never climbing ladders, ropes, or scaffolds; climbing ramps and stairs only occasionally; no more than frequent balancing, stooping, crouching, kneeling, and crawling; avoiding exposure to moving machinery and unprotected heights; a sit/stand option; and no more than frequent handling and fingering bilaterally. Tr. 54 ¶ 5; 59 ¶ 6. Plaintiff has not convincingly demonstrated that these RFC determinations failed to accommodate any limitations her syrinx may have imposed.

In reaching his RFC determinations, the ALJ gave only "some, but not great weight" to the two state agency physical RFC assessments of record (Tr. 127-34, 707-14). Tr. 58 ¶ 5. Both found plaintiff capable of medium work (*i.e.*, work involving lifting, carrying, pushing, or

---

[15] While the ALJ admittedly did not discuss syrinx in his step three listing analysis, his subsequent discussion makes clear why he did not find it, in combination with plaintiff's other impairments, to meet any listings, including in particular Listing 11.19 for syrinx. The fact that his explanation did not appear at step three is not error because the decision must be read as a whole. *See Forbes v. Colvin*, No. 4:12–CV–211–FL, 2013 WL 4759086, at *8 (E.D.N.C. 23 July 2013), *mem. and recommendation adopted by* 2013 WL 4759086, at *3 (4 Sept. 2013). The criteria for Listing 11.19 are syrinx with "[s]ignificant bulbar signs; or . . . [d]isorganization of motor function as described in 11.04B" (*i.e.*, "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station.").

pulling up to 50 pounds occasionally and 25 pounds frequently)[16] with no postural, manipulative, or environmental limitations. (Tr. 128-31, 708-11). The ALJ reasoned that the assessments "give fair, but not sufficient consideration to the claimant's impairments and limitations arising there from." *See* Tr. 58 ¶ 5.

In support of her contentions regarding syrinx, plaintiff points to a description of the disease that she included with correspondence to the SSA dated 23 February 2012. *See* Tr. 32-35; 325-28 (additional copy). That information is of a generic nature and does not relate specifically to plaintiff. While it arguably shows the potential limitations syrinx can impose on a person, it does not purport to show the limitations actually imposed on plaintiff during the relevant period.

Plaintiff contends that her lack of pain at the November 1999 and September 2000 emergency room visits reflected her use of medication at the time, rather than the true condition of her spine. Of course, to the extent that her back pain was remediable by medication, it was not disabling. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.").

On the other hand, as noted, at the November 1999 visit, plaintiff reported that she was not then on any pain medication. Tr. 400. At the September 2000 visit, she reported she reported only Naproxen (a nonsteroidal anti-inflammatory drug)[17] as a current medication. Tr. 395. According to plaintiff's own contemporaneous reports, she continued to feel pain, albeit in other parts of her body. This circumstance tends to point to lack of harm to the back, rather than medications, as the cause of any absence of pain. The court concludes that the ALJ committed

---

[16] *See* 20 C.F.R. § 404.1567(c); *see also* DOT, app. C § IV, def. of "Medium Work," http://www.oalj.dol.gov/libdot.htm (last visited 21 July 2014).

[17] *See* Def. of "Naproxen," Medline Plus, U.S. Nat'l Library of Medicine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (last visited 21 July 2014).

no error in his evaluation of the evidence of plaintiff's reported pain during the emergency room visits in question.

Plaintiff also contends that the ALJ erred in finding that the medical records indicate that she was rollerblading in connection with the September 2000 emergency room visit, arguing that her fall shows that she could not rollerblade. *See* Tr. 57 ¶ 5; 58 ¶ 5. Plaintiff similarly challenges the ALJ's finding that at the hearing she "did acknowledge going rollerblading in 2000." Tr. 56 ¶ 5. The court finds no error.

The emergency physician's report for the September 2000 visit states: "This 38-year-old female was roller blading with her son at Jelly Beans this afternoon." Tr. 395. At the hearing, plaintiff testified, in relevant part: "I did put on roller blades. I shouldn't have." Tr. 96. She did not testify that she fell immediately or was unable to travel any distance, or make some other statement clearly supportive of her contention. The court cannot say that the ALJ's interpretation of this evidence was improper.

Similarly, plaintiff cites the fall that was the subject of the November 2000 emergency room visit as proof that her ability to walk was severely impaired. Again, though, the court finds the ALJ's determination to the effect that she did retain the capacity to walk proper. *See* Tr. 58 ¶ 5.

Plaintiff argues that it was unfair for the ALJ to rely on her statement in December 2004 about climbing stairs and exercising "until recently," as well as the related statement in November 2004 about regularly walking two to four miles daily, because this evidence postdates the DLI and the ALJ stressed at the hearing—held over eight years after the DLI—that plaintiff's post-DLI condition was not at issue. *See* Tr. 57 ¶ 5. But the ALJ did not say that evidence

generated after the DLI was necessarily irrelevant. Instead, he was careful to explain that such evidence could be relevant if it related to the relevant period. As the ALJ explained:

> So, unless those documents show me something that was so chronic it was disabling back in 2002, when your insurance expired, I don't even have to see those records really because what happened to you a month ago, two months ago, last year, in 2009 is irrelevant *unless it relates back to 2002*, when your insurance expired.

Tr. 72-73 (emphasis added). The challenged representations by plaintiff were such backward-looking evidence.

That post-DLI evidence could be used to shed light on plaintiff's condition during the relevant period was also made evident to plaintiff at the hearing by her own lawyer's questioning of her regarding a functional capacity evaluation of her in 2010 as a point of comparison to her limitations during the relevant period. *See* Tr. 94-95.

Plaintiff points out that her syrinx will not go away. The ALJ, of course, made no finding to the contrary. Indeed, he expressly referenced Dr. Haglund's finding that plaintiff's syrinx needs to be followed over a long period of time. Tr. 56 ¶ 5.

Plaintiff also argues that cardiac problems she experienced prompting various unidentified emergency room visits could have been the result of her syrinx or medication complications. She also argues that when she engaged in activities beyond her alleged limitations it was a result of impairment of her judgment by the medication she was taking. These contentions are unconvincing because, among other reasons, plaintiff lacks the qualifications to make such medical judgments and they lack support in the medical records.

Plaintiff contends that following her surgery in February 1998, her physician instructed her to limit her activities, including specifically not lifting anything heavier than a gallon of milk.

*See, e.g.,* Tr. 98-99 (plaintiff's hearing testimony).[18]  But plaintiff testified to that effect at the hearing.  Tr. 99.  Plaintiff has not shown that the ALJ failed to consider the evidence of instructions given her by her physicians or gave it improper weight.

For this and the other reasons stated, the court finds that the ALJ's evaluation of plaintiff's syrinx, including his RFC determination as it relates to plaintiff's syrinx,[19] is supported by substantial evidence and based on the proper legal standards.  This challenge to the ALJ's decision should accordingly be rejected.

### 4.  ALJ's Assessment of Plaintiff's Credibility

It is apparent that plaintiff also disputes the ALJ's determination that her allegations regarding her impairments and the limitations they imposed were not fully credible.  The court finds no error.

Plaintiff testified at the hearing to the effect that her impairments placed significant limitations on her activities.  The ALJ summarized her testimony in relevant part as follows:

> According to the claimant, after hyperextending her spine, she started having severe headaches, constant right and left arm pain, leg numbness, and difficulty with falling when her left leg would "go out from under" her. Surgery was performed in February 1998, however, she testified she continued to have headaches, pain, and numbness following surgery. The claimant further endorsed having difficulty with sitting and walking subsequent to surgery in addition to sustaining additional injuries from falling due to her left leg going out.
>
> In detailing her limitations from 1997 through 2002, the claimant testified she was unable to walk a city block, was unable to climb stairs, used a walker for assistance, had diminished bilateral arm strength and would drop things with her left hand, had difficulty dressing herself, had memory deficiencies due to depression, and had difficulty sleeping due to back pain. Overall, the claimant testified that during the relevant period of time, she could not lift more than 5

---

[18] Interestingly, plaintiff also testified that by 2004 her physicians were pushing her to walk two to four miles a day. *See* Tr. 97 ("That's what the doctors pushed me to do. They want me to — they kept saying, you need to do more. You need to do more, and I kept pushing to do more. It doesn't mean it felt good. It's what the doctors pushed me to do.").

[19] The court finds that the ALJ's RFC determination is otherwise supported by substantial evidence and based on the proper legal standards.

pounds, walk for more than 9 minutes without needing a break, could not sit up for 60 minutes, and had bilateral arm tremors (right greater than left). She did acknowledge going rollerblading in 2000, and further admitted she was walking 2 to 4 miles a day (she testified that she did so with difficulty) pursuant to doctor recommendations.

Tr. 55-56 ¶ 5.

The ALJ's assessment of a claimant's credibility involves a two-step process. Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *2 (2 July 1996); *accord Craig v. Chafer*, 76 F.3d 585, 589 (4th Cir. 1996). First, the ALJ must determine whether the claimant's medically documented impairments could cause the claimant's alleged symptoms. Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *2. Next, the ALJ must evaluate the claimant's statements concerning those symptoms. *Id.*; *see also* 20 C.F.R. § 404.1529 (setting out factors in evaluation of a claimant's pain and other symptoms). If the ALJ does not find the claimant's statements to be credible, the ALJ must cite "specific reasons" for that finding that are "supported by the evidence." Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *2, 4; *Jonson v. Colvin*, No. 12cv1742, 2013 WL 1314781, at *7 (W.D. Pa. 28 Mar. 2013) ("If an ALJ concludes the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision."); *accord Dean v. Barnhart*, 421 F. Supp. 2d 898, 906 (D.S.C. 2006).

Here, in assessing plaintiff's allegations, the ALJ made the step-one finding that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 57 ¶ 5. At the second step of the credibility assessment, the ALJ found that plaintiff's allegations were not fully credible. Tr. 57 ¶ 5. Specifically, he stated that "the [plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . [RFC] assessment," that is the principal, not alternative, RFC assessment. Tr. 57 ¶ 5.

The ALJ provided specific reasons for his credibility determination. Tr. 57 ¶ 5. He stated:

> Although the claimant has described daily activities that are fairly limited during the relevant period, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities were truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

> The claimant did undergo surgery for the alleged impairment, which certainly suggests that the symptoms were genuine. While that fact would normally weigh in the claimant's favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms. Following surgery and through the date last insured, the record reveals relatively infrequent trips to the doctor for the allegedly disabling symptoms. The emergency department notes reflect several occasions on which the claimant did not specify any particular complaint related to her back, which contrasts with the current claim of ongoing, disabling symptoms since the alleged onset date. In addition, the claimant's use of medications did not suggest the presence of an impairment that is more limiting than found in this decision. Moreover, even the testimony of the claimant's sister and friend indicate that the claimant was talking on the phone, emailing, and — from time to time — attending craft fairs, and getting together for lunch and dinner.

> Furthermore, contrary to the claimant's testimony that she has essentially been quite limited since before the date last insured, the medical record indicates that she was rollerblading, "regularly" walking long distances for exercise, climbing stairs, and doing yardwork and other activities "without difficulty" in 2004.

Tr. 57-58 ¶ 5. These findings by the ALJ are supported by substantial evidence of record, including the medical evidence previously discussed.

The ALJ considered as part of his analysis the hearing testimony of plaintiff's sister (Tr. 101-04) and a friend of plaintiff (Tr. 104-10), and a letter from a coworker and friend of plaintiff (Tr. 310-11), which portrayed plaintiff as more limited functionally than the ALJ found. The ALJ did not fully credit their testimony for the following reasons:

The claimant's coworker and friend Amy Hamrick submitted a letter on her behalf. In addition, the claimant's sister and a friend testified on her behalf. The opinions of the coworker, friend, and sister do not establish that the claimant is disabled. Since they [are] not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, the accuracy of the opinions are questionable. Moreover, by virtue of the relationship with the claimant, they cannot be considered disinterested third party witnesses whose opinions would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges. Further, the range of activities they indicated she was capable of performing is inconsistent with those I have found above. Notwithstanding, the opinions were considered in formulating the limitations included in the claimant's residual functional capacity. (Ex.11E).

Tr. 58 ¶ 5. The court finds no error in the ALJ's analysis of this evidence.

It is clear that the ALJ did not completely discount plaintiff's allegations. As discussed, his RFC determinations include numerous restrictions responsive to the limitations she alleges. Tr. 54 ¶ 5; 59 ¶ 5. In developing his RFC determination, as also noted, the ALJ gave only some weight to the state agency RFC assessments on the grounds that they did not give sufficient consideration to plaintiff's impairments and the limitations arising from them. *See* Tr. 58 ¶ 5.

As indicated, the ALJ relied, in part, on post-DLI evidence in his assessment of plaintiff's credibility. *See* Tr. 58 ¶ 5. As discussed earlier, some of that evidence was retrospective in nature, looking back to the relevant period, and bore directly on the truthfulness of plaintiff's statements regarding that period. But the ALJ could also properly evaluate the credibility of plaintiff's statements regarding the post-DLI period and consider the post-DLI medical evidence in doing so. Plaintiff's credibility regarding the post-DLI period could reasonably be deemed by the ALJ to reflect on her credibility generally, including with respect to the relevant period.

The court concludes that the ALJ's determination of plaintiff's credibility was based on proper legal standards and supported by substantial evidence. This challenge to the ALJ's decision should accordingly be rejected.

### 5.    Other Contentions by Plaintiff

Plaintiff argues that the ALJ should have taken into account her diagnosis of myelomalacia.  But the medical records do not reflect that diagnosis until 2004, well after the DLI.  *See* Tr. 404 (2004), 411 (same), 428 (2005), 630 (2006), 631 (2004), 676 (2005).

Plaintiff further contends that she should be awarded benefits because the Commissioner negligently served various documents on her tardily or not at all in the administrative proceeding after the ALJ's decision, misrepresented doing so, and thereby intentionally caused her emotional distress.  As noted previously, though, the proceedings before the Appeals Council are not appealable because its denial of review is not a final order.  *See Gill*, 2013 WL 1817353, at *4.    In addition, plaintiff was not prejudiced by any delay in service of the notice of denial because she timely commenced the instant court action.

Plaintiff makes similar arguments regarding alleged tardy service by the Commissioner of filings she has made in this case.  As noted previously, she has not convincingly established that the Commissioner did serve filings late.  Even if the Commissioner were deemed to have been untimely, such untimeliness could be a basis for an award to plaintiff only as a sanction.  Any such tardiness did not come close to the level of noncompliance to merit such a drastic sanction.

To the extent that plaintiff seeks to assert claims for negligence, misrepresentation, or intentional infliction of emotional distress, such claims are not permitted under 42 U.S.C. § 405(h), which provides, "No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 [federal question jurisdiction] or 1346 [Federal Tort Claims Act] of Title 28 to recover on any claim arising under this subchapter."  42 U.S.C. § 405(h); *see also Jarrett v. United States*, 874 F.2d

201, 204-05 (4th Cir. 1989) (holding that § 405(h) bars an action for intentional infliction of emotional distress caused by wrongful termination of benefits because such claim arose under the Social Security Act) (citing *Schweiker v. Chilicky*, 487 U.S. 412, 429 (1988) (holding that § 405(h) prohibited plaintiffs from bringing an action for emotional distress and loss of necessities caused by the improper termination of benefits)); *Cunningham v. Social Sec. Admin.*, 311 Fed. Appx. 90, 92 (10th Cir. 2009) (holding that, pursuant to § 405(h), the court had no jurisdiction over plaintiff's claims against the SSA for constructive fraud, indemnification, and intentional infliction of emotional harm).

Plaintiff also contends that evidence in the record about her activities of daily living during the relevant period tends to overstate her capacity for such activities because such evidence does not take into consideration the modifications she claims were made to her home to accommodate her limitations. Needless to say, if plaintiff had wanted the ALJ to consider such alleged modifications, she could have presented evidence of them at the hearing. She has not justified her failure to do so. Nor can such information be deemed to be material.

### 6. Summary

After careful consideration of the ALJ's decision and the other portions of the record and for the reasons stated, the court concludes that the decision is supported by substantial evidence of record and based on the proper legal standards. It will therefore be recommended that the Commissioner's motion for judgment on the pleadings be allowed, plaintiff's motion for summary judgment be denied, and the Commissioner's final decision be affirmed.

## VI. CONCLUSION

IT IS RECOMMENDED that:

1. Plaintiff's motion for default judgment (D.E. 28) be DENIED;

2.      Plaintiff's suggestions of subsequently decided authority (D.E. 7, 31) be ALLOWED;

3.      Plaintiff's motion (D.E. 30) to amend her summary judgment motion be ALLOWED;

4.      Plaintiff's motion for summary judgment (D.E. 25) be DENIED; and

5.      The Commissioner's motion for judgment on the pleadings (D.E. 33) be ALLOWED and the final decision of the Commissioner be AFFIRMED.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have until 4 August 2014 to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.  Any response to objections shall be filed within 14 days after service of the objections on the responding party.

This, the 21st day of July 2014.

James E. Gates
United States Magistrate Judge